UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                  :
U.S. Commodity Futures Trading    :
Commission,                       :
                                  :
                    Plaintiff,    :
                                  :
        -against-                 :
                                  :    05 Civ 08422(KMW)
Alexsander Efrosman a/k/a Alex    :    Opinion and Order
Besser, AJR Capital Inc., and     :
Century Maxim Fund Inc.,          :
                                  :
                    Defendants.   :
----------------------------------X

WOOD, U.S.D.J.

        The Court is now presented with the question of which of two

judgment creditors, Plaintiff Commodity Futures Trading

Commission (the "CFTC"), or Intervenors Eric Migliorino, Rosa

Migliorino, Gerardo Lordi, Maria Lordi, and Vincenzo Lordi (the

"Migliorino Intervenors"), has priority to funds in the North

Fork Bank account of Defendant AJR Capital Inc. ("AJR Capital").

        This question comes before the Court as follows.  In 2007,

this Court entered default judgment in the instant case in favor

of the CFTC, and against Alexander Efrosman ("Efrosman"), AJR

Capital, and Century Maxim Fund, Inc. ("Century Maxim")

(collectively "Defendants").  The Court ruled that Defendants had

violated the Commodities Exchange Act ("CEA") by operating a

fraudulent investing scheme involving foreign currency futures.

The Court ruled that any remaining funds in AJR Capital's North

1

Fork Bank account ("the funds") should be turned over to the CFTC, to be distributed pro rata among all defrauded investors, as restitution.

Following entry of judgment, the Migliorino Intervenors, five individual investors in Defendants' scheme, moved to intervene in this action, claiming that they had superior rights to the funds.  The Migliorino Intervenors told the Court that they had independently sued AJR Capital in New Jersey state court, and that the New Jersey court had entered default judgment in their favor in 2005 – approximately a year and a half before this Court entered its judgment for the CFTC.  The Court permitted the Migliorino Intervenors to intervene in this action for the purpose of asserting their claim to the funds.

The Migliorino Intervenors now move for a judicial determination that they have priority to the funds, such that they may recover their losses in the entirety, or at minimum recover their attorneys' fees, before the CFTC distributes the funds pro rata among the victims of Defendants' fraud. Specifically, the Migliorino Intervenors argue that their rights are superior to the CFTC's because (1) this Court's judgment in favor of the CFTC is void for lack of jurisdiction; (2) the law of priority weighs in the Migliorino Intervenors' favor because they levied the funds before this Court entered judgment for the CFTC; and (3) equitable considerations weigh in the Migliorino

Intervenors' favor because they have invested significant time and money in their effort to recover from Defendants.

The CFTC, which opposes any preferential payment to the Migliorino Intervenors and continues to seek a pro rata distribution of the funds in their entirety among all defrauded investors, disagrees with each of the Migliorino Intervenors' arguments.  The CFTC maintains that (1) this Court's judgment in favor of the CFTC is not void, because this Court has subject matter jurisdiction over the action; (2) the law of priority weighs in the CFTC's favor because this Court froze all funds in AJR Capital's bank account before the Migliorino Intervenors executed their levy; and (3) equitable considerations weigh in favor of a pro rata distribution of the funds to all investors defrauded by Defendants.[1]

For the reasons stated below, the Court disagrees with the Migliorino Intervenors.  The Court finds that (1) its judgment in favor of the CFTC is not void for lack of jurisdiction; (2) it is unnecessary to reach the question of which party has legal priority to the funds; and (3) equitable considerations weigh in favor of a pro rata distribution of the funds to all defrauded investors.  The Court DENIES the Migliorino Intervenors' motion

---

[1] A second set of approximately twenty investors, the "Iatarola Intervenors," joins the CFTC in opposing the Migliorino Intervenors' motion, and request a pro rata distribution of the funds.

to be accorded priority.

I.  Background

   A.  Parties

      1.  Defendants

     Both the instant case and the case filed by the Migliorino
Intervenors in New Jersey state court arise from a fraudulent
investment scheme.  Defendants are the perpetrators of that
scheme.  Specifically, Efrosman is the individual who engineered
the scheme, and AJR Capital and Century Maxim are New York
corporations, created by Efrosman, for the purposes of putting
the scheme into effect.

      2.  CFTC

     The CFTC is an independent federal agency, charged with
protecting market users and the public from fraud, manipulation,
and abusive practices related to the sale of commodity and
financial futures and options.[2]  The CFTC is authorized to bring
enforcement actions against those who violate the CEA.

      3.  Intervenors

     The Migliorino Intervenors and the Iatarola Intervenors are
victims of Defendants' scheme.  Defendants misappropriated
$75,500 from the five Migliorino Intervenors, and in excess of
$700,000 from the twenty Iatarola Intervenors.

---

     [2] About the CFTC,
http://www.cftc.gov/aboutthecftc/index.htm.

B.  Defendants' Fraudulent Investment Scheme

        1.  Details of Scheme

Between January 2004 and June 2005, Efrosman solicited more than $5,000,000 from approximately 110 unsophisticated retail investors, by promising to use the money to make investments on each customer's behalf.[3]  Efrosman recruited prospective investors by telling them that he could secure high rates of return, and minimize risk, on their investments.  He supported his claims with falsified account statements.

        2.  Use of North Fork Bank Accounts

Efrosman directed his customers to wire transfer or deposit their money, for the purposes of investment, into bank accounts at North Fork Bank in the names of AJR Capital and Century Maxim.[4]  Investors' money was commingled in these accounts.

Throughout the course of his scheme, Efrosman provided

---

[3] Efrosman has a history of violating United States commodities laws.  In August 1997, the CFTC filed an administrative action against Efrosman charging him with, inter alia, fraud and illegal transactions in foreign currency futures. On account of these activities, the CFTC entered an order against Efrosman in 2000, finding him liable for certain violations of the CEA, ordering him to cease and desist from such violations, and assessing against him $500,000 in monetary penalties.

    In connection with these same activities, Efrosman was also indicted and convicted of mail and wire fraud.  After fleeing the country and being extradited back to the United States from France, Efrosman was sentenced to, and served, a three year term in prison.  He was released in 2003.

[4] Only those funds held in AJR Capital's North Fork Bank account are at issue in the instant dispute.

investors with fraudulent account statements that reflected substantial returns on their investments.  If a customer desired to withdraw her investment and its "profits," Efrosman paid that customer with the recently invested funds of other investors – in effect, a Ponzi scheme.

Between July 2004 and May 2005, AJR Capital's North Fork Bank account received deposits and wire transfers totaling $4,922,934.54.

### 3.  Nature of Transactions

There is substantial disagreement between the CFTC and the Migliorino Intervenors as to the nature of the transactions Efrosman offered to make on behalf of his customers.  The Migliorino Intervenors contend that Efrosman and his agents made clear that all transactions he entered into would be "spot" market transactions, and not futures contracts.[5]  In contrast,

---

[5] A futures contract involves an agreement to purchase or sell an item of value for delivery in the future at a price that is agreed upon at the time of the contract.  In contrast, spot market transactions involve relatively immediate payment for and delivery of a product.  See CFTC Glossary, http://www.cftc.gov/educationcenter/glossary/.

Different courts have taken different positions on how to distinguish between spot transactions and futures contracts.  Generally, however, spot transactions involve a shorter time frame, and may or may not involve actual exchange of a commodity.  Futures contracts operate on a longer time frame, and rarely, if ever, involve exchange of a commodity.  See, e.g., CFTC v. Int'l Financial Services, Inc., 323 F. Supp. 2d 482 (S.D.N.Y. 2004).

This distinction is important because the CFTC has jurisdiction to file suit against only those who transact illegally in futures contracts, and not against those who transact illegally on the spot market.  See 7 U.S.C. § 2.

the CFTC maintains that the transactions Efrosman claimed he would make were actually futures contracts according to the CFTC's multi-factor totality of the circumstances test.

### 4. End of Scheme

At some point in early June 2005, Efrosman fled the country. According to information obtained by the CFTC, Efrosman boarded a cruise ship in Key West, Florida on June 2, 2005.  He has not been heard from since.

By the time Efrosman's flight was discovered, the AJR Capital account retained a balance of only $213,485.49.  Bank records indicate that Efrosman never made any investments on his customers' behalf, but instead misappropriated the funds for his own personal use.

### C. Efforts to Recover the Funds

### 1. Pre-Lawsuit Discussions

On June 13, 2005, the Migliorino Intervenors learned that Efrosman had fled the county.  Eric Migliorino and his wife, Rosa Migliorino, then contacted the CFTC regarding potential claims against Defendants.

Eric and Rosa Migliorino spoke by phone with David Acevedo ("Acevedo"), an attorney with the CFTC, on June 14, 2005.  During their conversation, Acevedo informed the Migliorinos that although the CFTC was investigating the matter, the CFTC did not yet know whether it would file a lawsuit against Defendants.

Acevedo also informed the Migliorinos that the CFTC represented the interests of the general public, and not the interests of individuals.  Acevdeo also told the Migliorinos that he could not provide them with any legal advice.

          2.  Migliorino Intervenors' Lawsuit

Following their discussion with Acevedo on June 14, 2005, the Migliorino Intervenors retained private counsel.  This attorney allegedly informed them that, in his opinion, the CFTC lacked jurisdiction to pursue Defendants, because the transactions Efrosman claimed he would make were spot market transactions, and not futures contracts.  The Migliorino Intervenors then decided to bring their own lawsuit against Defendants.

On June 23, 2005, the Migliorino Intervenors filed a complaint against Efrosman, AJR Capital, and non-party Stephen Chiarella in New Jersey state court.

Early in the course of this litigation, the Migliorino Intervenors re-contacted the CFTC to ask again whether the CFTC intended to file suit against Defendants.  The CFTC declined, pursuant to 7 U.S.C. § 12(a)(1), to disclose what, if any, action it intended to take against Defendants.[6]

---

[6] 7 U.S.C. § 12(a)(1) provides that the CFTC "may withhold from public disclosure any data or information concerning or obtained in connection with any pending investigation of any person."

Efrosman, AJR Capital, and Stephen Chiarella never responded to the Migliorino Intervenors' complaint.  On October 25, 2005, the New Jersey state court entered default judgment in favor of the Migliorino Intervenors and against AJR Capital in the amount of $129,960.64.[7]  On November 23, 2005, the Sheriff of Somerset County executed a levy on the funds on behalf of the Migliorino Intervenors.

### 3.  CFTC's Lawsuit

In early June 2005, the CFTC was informed by an unnamed source about Defendants' fraudulent activities.  The CFTC began its investigation into Defendants' conduct soon thereafter.  The CFTC maintains that it began its investigation into Defendants prior to being contacted by the Migliorino Intervenors.

In the course of its investigation, the CFTC interviewed approximately twenty-five of Defendants' customers about Defendants' actions, and secured executed statements from six of them.  In addition, the CFTC obtained a sworn declaration from Eric Migliorino, which he agreed could be used in any future legal action by the CFTC against Defendants.

On September 30, 2005, the CFTC filed a complaint, under

---

[7] Although the Migliorino Intervenors invested only $75,500 in Defendants' scheme, their complaint alleged a loss of both their original investment and the fictitious "profits" earned on their investment.  The New Jersey state court entered default judgment in favor of the Migliorino Intervenors for this inflated amount.

seal, in this Court, charging Defendants with fraud and trade in illegal off-exchange futures contracts, in violation of various provisions of the CEA.  On that same day, this Court entered a preliminary injunction freezing all funds in AJR Capital's North Fork Bank account.

Defendants did not respond to the CFTC's complaint.  On March 27, 2007, the Court entered default judgment against Defendants and ordered them to pay restitution in the amount of $4,547,300.91.  At the CFTC's request, the Court appointed the National Futures Association ("NFA") to execute Defendants' restitution obligations.  The Court directed the NFA to distribute the funds in AJR Capital's North Fork Bank account to all of Defendants' victims on a <u>pro rata</u> basis.

D.   <u>Intervention and Motion to Determine Priority</u>

On July 6, 2007, the Migliorino Intervenors filed a motion to intervene in the instant case for the purpose of asserting their claim to the funds.[8]  The Court granted their motion to intervene.

On November 7, 2007, the Migliorino Intervenors filed their motion to determine priority.  The CFTC opposed the motion.

---

[8] According to the Migliorino Intervenors, they learned that the CFTC had filed suit against Defendants in December 2005, when North Fork Bank refused, on account of the Court's preliminary injunction, to release the levied funds to them.  The Migliorino Intervenors do not explain why, after learning about this action in December 2005, they waited over a year and a half to more to intervene.

On March 17, 2008, the Iatarola Interveners made their first appearance in this case, by submitting a letter to the Court detailing their own efforts to recover against Defendants, and voicing their opposition to the Migliorino Intevenors' motion to determine priority and their support for a pro rata distribution. The Court construed this letter as a motion to intervene, which it granted.  The Court permitted the Iatarola Intervenors to file their own brief in opposition to the Migliorino Intervenors' motion, which they did.

On August 19, 2008, the Court denied the Migliorino Intervenors' motion to determine priority, without prejudice to refiling.  The Court directed the parties to more fully explain certain facts and legal arguments in any renewed motion.

On November 10, 2008, the Migliorino Intervenors filed their renewed motion to determine priority, which both the CFTC and the Iatarola Intervenors oppose.  The Court now considers the merits of the Migliorino Intervenors' motion.

II.  Analysis

The Migliorino Intervenors make three arguments in support of their motion for priority: (1) that this Court's judgment in favor of the CFTC is void for lack of jurisdiction; (2) that even if the judgment in favor of the CFTC were not void, the Migliorino Intervenors have legal priority to the funds because their levy predates this Court's judgment in favor of the CFTC;

11

and (3) that the equities weigh in the Migliorino Intervenors'
favor because of their diligence in seeking to protect their
rights.

The Court considers each of these arguments in turn, and
finds none to be convincing.

A.   Jurisdiction

The Migliorino Intervenors first argue that they have
priority to the funds because the Court's judgment in favor of
the CFTC is void for lack of "jurisdiction," pursuant to 7 U.S.C.
§ 2 ("§ 2").  Specifically, they maintain that § 2 permits a
court to hear cases arising pursuant to the CEA only if the
fraudulent transactions underlying the case were "contracts of
sale of a commodity for future delivery."  The Migliorino
Intervenors maintain that the transactions Defendants claimed
they would make on behalf of their customers were spot market
transactions for immediate, not for future, delivery.
Accordingly, they argue that this Court lacks subject matter
jurisdiction over this case, and must declare void its judgment
in favor of the CFTC.

In response, the CFTC argues that 7 U.S.C. § 13a-1 ("§ 13a-
1") is the sole provision in the CEA that limits a court's
subject matter jurisdiction, and that § 13a-1 requires only that
it "appear" to the CFTC that there has been a violation of the
CEA in order for a court to have subject matter jurisdiction.

12

The CFTC thus maintains that the Court has subject matter jurisdiction in the matter, pursuant to § 13a-1 and 28 U.S.C. § 1331 ("§ 1331").[9]  As for § 2, the CFTC argues that its requirements, though necessary elements of a claim under the CEA, do not circumscribe federal court subject matter jurisdiction. The CFTC therefore asserts that the Migliorino Intervenors' arguments, even if fully credited,[10] do not raise a challenge to the <u>Court's subject matter jurisdiction</u>, but only to <u>the CFTC's enforcement jurisdiction</u>, an issue going to the merits that cannot be raised post-judgment.[11]  The Court agrees with the CFTC on each of these points.

---

[9] The CFTC also argues that the Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1345, which provides, "[e]xcept as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."  Because the Court finds that it has subject matter jurisdiction, pursuant to § 13a-1 and § 1331, the Court need not consider whether it also has subject matter jurisdiction pursuant to 28 U.S.C. § 1345.

[10] The CFTC also argues that the Migliorino Intervenors are wrong in substance, because the transactions Defendants claimed they would make on behalf of their customers were, pursuant to the CFTC's test, futures contracts, not spot transactions.  The Court does not reach this question, as it finds the actual nature of the transactions irrelevant post-judgment.

[11] The objection that a complaint fails to state a claim for which relief can be granted cannot be raised post-judgment.  <u>See</u> <u>Kontrick v. Ryan</u>, 540 U.S. 443, 459 (2004).  The objection that a federal court lacks subject matter jurisdiction, however, may be raised at any stage in the litigation, even after trial, by a party, or by a court on its own initiative.  <u>Id.</u> at 455.

1.   <u>Applicable Legal Standards</u>

    a.   <u>Distinguishing Between an Element of a Claim</u>
<u>and a Jurisdictional Requirement</u>

Whether a limitation on a statute's coverage constitutes an element of the action or a jurisdictional requirement is a question of great import post-judgment.  Nevertheless, for many years, there was significant confusion in both the United States Supreme Court and the lower courts as to how, practically, to differentiate between these two, sometimes conflated concepts.

In <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500, 516 (2006), the Supreme Court resolved this uncertainty by developing a bright-line rule: a statutory limitation is not a requirement for subject matter jurisdiction, unless Congress has clearly so indicated.

In <u>Arbaugh</u>, the Supreme Court was presented with the question whether the statutory requirement that an employer must have fifteen employees to be subject to liability under Title VII of the Civil Rights Act of 1964 constituted a requirement of federal court subject matter jurisdiction, or an element of the cause of action.  <u>Id.</u> at 503.  This distinction was dispositive in <u>Arbaugh</u>, just as it potentially could be here, because the case was post-judgment.

The Supreme Court decided that because challenges to subject matter jurisdiction are never moot, construing broadly what

constitutes a jurisdictional requirement would create too great a potential for "unfairness" and a "waste of judicial resources." Id. at 515.  The court accordingly held that statutory limitations should be construed as non-jurisdictional, unless Congress had clearly indicated to the contrary.

In applying this rule to the facts of the Arbaugh case, the court focused on three particular aspects of the relevant statutory language: (1) the employee-numerosity requirement did not refer to subject matter jurisdiction; (2) the employee-numerosity requirement was set forth in a non-jurisdictional provision of Title VII; and (3) the employee-numerosity requirement did not state that it was unwaivable, or that the courts should consider it sua sponte.  Id. at 514-15.  Based on these findings, the court held that the employee-numerosity requirement was not a requirement of subject matter jurisdiction, and could not be challenged post-judgment.

Accordingly, following Arbaugh, a statutory limitation should be treated as an element of a claim, unless Congress has clearly indicated that the limitation deprives the court of subject matter jurisdiction.  In divining what Congress has clearly indicated, courts should consider, inter alia, (1) whether the limitation explicitly refers to subject matter jurisdiction; (2) whether the limitation appears in a provision addressing subject matter jurisdiction; and (3) whether the

limitation states that it cannot be waived, or should be
considered by a court <u>sua sponte</u>.  <u>See</u> <u>id.</u>

        b.  <u>Applicable Jurisdictional Provisions</u>

      The CEA has two separate and distinct provisions that
discuss "jurisdiction."  The first of these provisions, § 13a-1,
clearly addresses subject matter jurisdiction.  Section 13a-1
states that courts have jurisdiction to hear claims arising from
the CEA whenever it "shall appear" to the CFTC that there has
been a violation of the CEA.[12]  <u>See</u> 7 U.S.C. § 13a-1 ("[w]henever
it shall appear to the [CFTC] that any registered entity or other
person has engaged . . . in any act or practice constituting a
violation of any provision of this chapter or any rule,
regulation, or order thereunder . . . the [CFTC] may bring an
action in the proper district court of the United States . . . to
enjoin such act or practice, or to enforce compliance with this
chapter, or any rule, regulation, or order thereunder, <u>and said
courts shall have jurisdiction to entertain such actions</u>.")
(emphasis added).

     A second provision of the CEA, § 2, addresses the
jurisdiction of the CFTC to bring enforcement actions.  According
to § 2, the CFTC has jurisdiction with respect to accounts,
agreements, and transactions "involving contracts of sale of a

---

    [12] Importantly, it is not contested, and the Court finds no
reason to doubt, that it "appeared" to the CFTC that Defendants
had violated the CEA.

commodity for future delivery."  7 U.S.C. § 2.  Courts
interpreting the breadth of § 2 have consistently held that spot
transactions, or transactions for immediate delivery of a
commodity, do not fall within the ambit of contracts for sale of
a commodity for future delivery.  See, e.g., CFTC v. Zelener, 373
F.3d 861 (7th Cir. 2004).

     2.  Application

The issue the Court must now decide is whether CEA subject
matter jurisdiction exists only over contracts to sell a
commodity for future delivery.  The Court holds that the
statement in § 2 that the CFTC has jurisdiction over "contracts
of sale of a commodity for futures delivery," is not a
requirement of federal court subject matter jurisdiction.

Congress has broadly authorized the federal courts to
exercise subject-matter jurisdiction over all "civil actions
arising under the Constitution, laws, or treaties of the United
States."  28 U.S.C. § 1331.  The CEA "surely is a law of the
United States."  Arbaugh, 546 U.S. at 505.  Because spot trading
is not a "contract of sale of a commodity for future delivery"
under § 2, however, the question becomes whether an action that
involves spot market transactions, rather than futures contracts,
actually "arises under" the CEA.

Following Arbaugh, the answer to this question turns on
whether Congress has clearly indicated that the requirements of §

17

2 limit a court's subject matter jurisdiction.  A close reading

of the language of § 2 reveals that Congress has <u>not</u> clearly so

indicated.  Section 2 does not discuss the authority of courts to

consider actions under the CEA.  Similarly, it does not state

that its requirements cannot be waived, or that a court should

consider them <u>sua sponte</u>.  Importantly, the requirements of § 2

are not repeated in § 13a-1, the provision of the CEA that

clearly does address subject matter jurisdiction.

     The sole indication that Congress meant for § 2 to impact

subject matter jurisdiction is that § 2 uses the term

"jurisdiction" to refer to the authority of the CFTC to bring

enforcement actions.  As the Supreme Court noted in <u>Arbaugh</u>,

however, "jurisdiction" is "a word of many, too many meanings."

<u>Arbaugh</u>, 546 U.S. at 510.  The Court agrees with the CFTC that

the word "jurisdiction" as used in § 2 refers not to the subject

matter jurisdiction of federal courts, but rather to the

enforcement jurisdiction of the CFTC.

     Pursuant to <u>Arbaugh</u>, then, § 2 merely sets forth an element

of a claim under the CEA, and not a requirement for subject

matter jurisdiction.[13]  The Migliorino Intervenors' arguments

_____

[13] In support of their arguments about the jurisdictional
nature of § 2, the Migliorino Intervenors cite several decisions,
which they argue stand for the proposition that the requirements
of § 2 define a court's subject matter jurisdiction, not just the
elements of a claim.  The Migliorino Intervenors incorrectly
characterize these decisions.
    No decisions cited by the Migliorino Intervenors hold that a

therefore raise, at best, a challenge to the merits of the
underlying claim.  Such a challenge is untimely and irrelevant
post-judgment.[14]  The Court has subject matter jurisdiction in
this case pursuant to § 1331 and § 13a-1.

B.  Distribution

Having concluded that the Court's judgment in favor of the

---

failure to fulfill all the requirements of § 2 deprives a court
of subject matter jurisdiction.  Rather, these decisions, which
address this issue pre-judgment and thus in a context where the
distinction between failure to state a claim and lack of subject
matter jurisdiction is less important, find that dismissal is
appropriate, but do not fully articulate the grounds for that
dismissal.  See, e.g., CFTC v. Zelener, No. 03 C 4346, 2003 WL
22284295, *2 (N.D. Ill. Oct. 3, 2003), aff'd, 373 F.3d 861 (7th
Cir. 2004) ("It is not entirely clear to the Court whether [the
argument that the defendants engaged in spot trading rather than
in futures trading] is actually a challenge to the Court's
subject matter jurisdiction or simply an argument that the CFTC
cannot state a claim under the statute.  But either way, it is
undisputed that unless the CFTC can show that [the defendant] was
trading futures contracts, it cannot maintain this action.").

[14] In the alternative, the Migliorino Intervenors argue that
even if their arguments are construed as a challenge to the
merits post-judgment and are thus legally barred, they are
nevertheless still relevant as an equitable consideration that
the Court may take into account in deciding whether to award the
Migliorino Intervenors priority to the funds.  That is, the
Migliorino Intervenors argue that the equities favor them even
more strongly if the CFTC overstepped the bounds of its
enforcement jurisdiction in initiating this action.  The Court
disagrees.
As discussed below, the Court concludes that a pro rata
distribution of the funds is the most equitable result in this
case.  And, even assuming, arguendo, that the CFTC did lack
enforcement jurisdiction, the Court would still find that a pro
rata distribution was the best remedy.  There are 105 victims of
Defendants' scheme in addition to the five Migliorino
Intervenors.  It would be inequitable to punish them for any
mistake by the CFTC.

CFTC is valid, the Court now turns to the question of how the funds should be distributed, given the Migliorino Intervenors' and the CFTC's competing claims to the funds.

      1. <u>Legal Priority</u>

The parties begin their discussion of distribution with arguments based on the law of priority, that is, the body of law that specifies the order in which competing judgments should be given effect.  The Migliorino Intervenors argue that because their levy was executed on the funds before this Court entered default judgment for the CFTC, the Migliorino Intervenors have priority under the "first in time, first in right" rule for effectuating judgments.  In response, the CFTC argues that because this Count issued a preliminary injunction freezing the funds before the Migliorino Intervenors executed their levy, the levy was ineffectual.  The CFTC maintains that it has legal priority to the funds, based on the Court's preliminary injunction.[15]

After carefully considering the parties' arguments, the Court concludes that the law of priority is not the appropriate mechanism for determining what relief should be awarded in the instant case.  The CFTC brought this suit in equity, not in law, seeking restitution, not damages.  As an equitable remedy,

---

[15] Although the parties raise these arguments, it is unclear whether they believe the Court is bound by them.  As discussed below, the Court concludes that it is not so bound.

restitution is awarded based on equitable considerations, not legal technicalities.  Cf. SEC v. Credit Bancorp, Ltd., 290 F.3d 80, 88 (2d Cir. 2002) (finding that even a constructive trust would not defeat "the equitable authority of the District Court to treat all the fraud victims alike . . . and order a pro rata distribution); United States v. Benitez, 779 F.2d 135 (2d Cir. 1985) (affirming district court's decision not to accord priority to two judgment creditors because to do so would be inequitable to the other claimants).  The Court therefore does not reach the question of who has legal priority to the funds.  Rather, the Court will decide how the funds should be distributed based on a weighing of the equities.

   2.  Equitable Considerations

   The Court thus turns to the heart of this motion – a determination of how the funds can be distributed most equitably. The Court concludes that the most equitable result is a pro rata distribution of the funds.

      a.  Legal Standard

   In the Second Circuit, the pro rata distribution of funds to fraud victims is generally presumed to be the most equitable relief.  This is especially true when victims are similarly situated in their relationships with the defrauders, and the funds of the victims have been commingled.  SEC v. Credit Bancorp, Ltd., 290 F.3d at 88-89.  In such cases, the Second

Circuit has made clear that no victim has a greater equitable right to restitution than any other victim.  All have been similarly harmed, and all are entitled to benefit equally, in proportion to how much they have lost, from any available restitution.

Under some circumstances, however, equitable principles can weigh in favor of awarding priority to certain victims over others.  These circumstances usually involve particularly meritorious behavior on the part of the victim awarded priority and/or particularly unmeritorious behavior on the part of the other victims.  See, e.g., Gonzalez v. Access Trade Co., Inc., No, 04 Civ. 3762, 2005 WL 1384019, *5 (S.D.N.Y. June 9, 2005) (awarding preference to a group of private litigants over the CFTC because the efforts of the private litigants alerted the CFTC to the defendants' illegal activity, the other victims in the case had never appeared in any action, nor make any effort, including contacting the CFTC, to recover their losses, and the private litigants had expended considerable time, effort, and monetary resources in pursuing their suit).

    b.  Application

Here, all victims are similarly situated with respect to their relationship with the Defendants, and all victims' monies have been commingled in Defendants' bank accounts.  The facts weigh heavily in favor of a pro rata distribution of the funds.

Nevertheless, the Migliorino Intervenors argue that there are significant equitable considerations to the contrary that support awarding them priority to the funds.  The Court disagrees.

The Migliorino Intervenors first argue that they should be able to fully recover their losses before the funds are distributed pro rata among the remaining victims because of the considerable time and expense they have expended in their pursuit of Defendants.  The Migliorino Intervenors maintain that they have prosecuted their rights to the fullest extent of the law, and therefore deserve greater compensation than those who have "slept on their rights."

The Court disagrees.  It is true that the Migliorino Intervenors have expended considerable time and money in their pursuit of Defendants.  They, however, are not alone in this regard.  The Iatarola Intervenors have also expended considerable time and money in their pursuit of Defendants.  Similarly, a significant portion of Defendants' victims have expended time, if not money, in aiding the CFTC in its investigation into Defendants' activities.  This is not a case in which one victim is single-handedly responsible for all efforts that made recovery possible, while the other victims have "slept."  The Migliorino Intervenors have not contributed enough, as compared to the other victims, to defeat the general principle that pro rata distribution among fraud victims is the most equitable result.

23

Alternatively, the Migliorino Intervenors argue that they, at minimum, should be reimbursed for all attorneys' fees incurred pursuing Defendants before any <u>pro rata</u> distribution of the funds is made.  They argue that this result is equitable because the Migliorino Intervenors chose to pursue Defendants independently, and thus incurred attorneys' fees, only because the CFTC did not inform them that it intended to file suit against Defendants.

The Court again disagrees.  Although it is undisputed that the CFTC did not inform the Migliorino Intervenors that they were filing suit against Defendants, the Migliorino Intervenors fail to show that the CFTC had a duty to do so, or that the CFTC acted wrongly in this regard.  Contrary to previous representations by the Migliorino Intervenors, the CFTC did <u>not</u> tell the Migliorino Intervenors to sue Defendants.  The CFTC simply informed the Migliorino Intervenors that the CFTC's mission was to protect the public, rather than them as individuals; that the CFTC was not permitted to give the Migliorino Intervenors any legal advice; and that, pursuant to statute, all information about the CFTC's investigation into Defendants' activities was confidential.

The Court acknowledges that it may have been frustrating for the Migliorino Intervenors to be left uncertain as to what actions the CFTC might take that could affect their rights.  The CFTC, however, is statutorily permitted to keep its investigations and intentions confidential.  The Court therefore

24

will not find that the CFTC's exercising of its statutory right to confidentiality weighs against it in equity.

Finally, the Court notes that any weighing of the equities must take into account not only the CFTC and the Migliorino Intervenors, but also the 105 other victims of Defendants' fraudulent activities.  The Court concludes that it would be inequitable here to give the Migliorino Intervenors, a group of five victims who in total lost only $75,500, priority to the funds, when there are a total of 110 victims of Defendants' scheme, who lost collectively over $5,000,000.

For all of these reasons, the Court finds that the equities weigh in favor of a <u>pro rata</u> distribution of the funds.

III.  <u>Conclusion</u>

For the reasons stated above, the Court DENIES the Migliorinos' motion to accord them priority (D.E. 72).  The Court orders that the funds be distributed, on a <u>pro rata</u> basis, to all victims of Defendants' scheme.  The Clerk of the Court is directed to close this case; any pending motions are moot.

III.  Conclusion

For the reasons stated above, the Court DENIES the Migliorinos' motion to accord them priority (D.E. 72).  The Court orders that the funds be distributed, on a pro rata basis, to all victims of Defendants' scheme.  The Clerk of the Court is directed to close this case; any pending motions are moot.

SO ORDERED.

DATED:    New York, New York
          ~~August~~ , 2009
          Sept. 16,

Kimba M. Wood

KIMBA M. WOOD
United States District Judge

27